Argument not to exceed 15 minutes per side. Mr. Germany, you may proceed for the appellant. Good morning, your honors. May it please the court, Ned Germany on behalf of Mr. Hearn, I'd ask for five minutes for rebuttal, please. Fine. Your honors, as you know, the facts in this case are undisputed, very brief factual pattern. Officers in this case, well, Ms. Harden, Mr. Hearn's girlfriend, calls dispatch, calls the police department, says that her boyfriend has just been arrested for domestic violence and he's gotten released from jail. He's back at her house and she wants him gone. There's no indication from her that he was armed. The police have relayed this information from dispatch. Pretty scant details from dispatch to police. All it basically says is that Mr. Hearn is at the residence, he's been recently released from a domestic violence charge. One of the officers on the scene had actually been on that call, the domestic call, about a month earlier, I think in May of 2019. This call actually happened in June of 2019. The reason these facts are so just kind of casually walking up at first and you can tell something does catch their attention because they do start You can hear something in the audio, correct? It is. So they start running towards the door. Now what they described is yelling and maybe a slapping sound. I did ask the officers as they were testifying if they could identify the slapping sound. They couldn't really identify it, but the court, both the magistrate and the district court who reviewed the audio said that they could discern a slapping sound, although the officers couldn't. We're not really disputing that. You're not challenging any of the facts that the magistrate judge found? We're not. We didn't challenge it. We're familiar with that. What is the essence of your claim here? Well, so as the officers were sort of running towards the home, there's a glass door that they came to. Now our principal argument, our principal point is when these officers get to a door, they're going to have a decision to make. Is there potentially exigent circumstances? Maybe. I mean there's a loud noise, potentially a slapping noise. And they've been called by someone who says there has been domestic violence by a person inside the house. There was a prior domestic incident. But the reason for the call and the reason for the police coming to the house is because of the allegation of Ms. Harden that there was domestic violence going on by her boyfriend, Mr. Hearn. I don't think that's the information that was relayed. I think what she told the police specifically was he's just been released from jail on a prior domestic allegation. And he's hitting on me again or I don't want him hitting on me again or something like that. She did. She did say that. But I don't believe that that information was actually relayed to the dispatch. I thought the only thing that wasn't relayed to the officers was that the woman had said that he did not have a weapon. Correct. That is actually, she did not say, I mean she did say that he didn't have a weapon. So the officers don't have a, they're not there on a domestic call. They're there, really what it sounds like to me, if you're trying to figure out why she really called is it seems like maybe he had a protective order is what she was referring to. There's no allegations that he was engaged in domestic at the time. I have quotes from the record. He just got out of jail for domestic violence and was, quote, trying to start back acting up. Right. That's true. And I don't think that that specifically was relayed to the officers, that portion of it. They're trying to start, I don't really, I mean it's not necessarily an allegation that he's engaged in physicality or whatever. So I'm just, the point is they have pretty limited information. Does it really matter what the officers knew? I mean, Fourth Amendment analysis is an objective analysis as opposed to subjective, is it not? I would agree with that. All right, so even if an officer didn't know everything, if what the officer did is objectively reasonable under the Fourth Amendment, we still sustain it, don't we? Well, our position is that it was not reasonable. Okay, and you're saying it's not reasonable. He came up to the door and they just saw the two men sitting there. Right. And they didn't see the alleged victim or they didn't see any problem there. At that point, they should have gotten a warrant, I guess. It's your argument. Yes, Your Honor. I think what a reasonable, prudent officer should have done with the information that they have, all of it. I mean, the prior domestic, he's back, maybe he's violating a protective order, there's no information that he was armed. At that point, when you get to the door, this is a glass door. If they had simply, number one, they could have knocked even if it was a wooden door. Number two, we're not going to require them to knock because it's a wooden door and they can't see what's going on inside the home. The Supreme Court said in Sharp, you can always imagine different and better ways, but that's not the standard, right? It's not our job to second guess whether there was a less intrusive means with 20-20 hindsight. And I would agree with that. But in this case, in every case is... So our job is to look, was it reasonable? Did they have exigent circumstances? Here they hear screaming, they hear what appears to them to be a slap. As Judge Moore pointed out, you're not controverting that. And so they had been there, Officer Tracy had been there a month before for domestic violence. They hear that, they go running up and go in. They don't stop because domestic violence is a highly combustible encounter and they want to stop whatever is going on. And what you're saying is second guess them and have them come up and knock even if there's violence going on inside the home. Well, I'm not second guessing the officers as far as they have maybe a suspicion that there might be something going on in the house. There might be an exigency. And so we're going to, certainly we want them to act. They're officers, they have a very tough job. But when they get to the door and the door happens to be glass and you can simply right there... Did they stop and look through it and see what was going on and then go running in? Or did they just run in? Because my understanding, maybe I'm wrong, was they heard it, slapping coming from the house and thinking an assault was taking place, they ran into the house. They did not stop. They pretty much was all in one motion. They ran, they ran to the door, they opened it up. And my point is, when you get to the door, you have a decision as an officer to make. We all know that that threshold of the door, we all know about Peyton, how the sanctity of a home should be respected. And I understand that these officers have a difficult task. You agree. Imagine a scenario, let me give you a scenario. He's actually in there beating her up. Are you saying the officers should not, and they hear exactly what they hear, and he's in there beating her up, they still should have stopped and knocked? They could have dispelled their initial fear. They do hear some things. As they're running up and they see a glass door, at that point in time, they could have easily seen Mr. Hearn sitting on the couch. They could have. I'm not, look, no one's disputing that. The question is, do they have to stop at the door when they hear this going on? In the circumstance where they can easily see into the home and assess whether or not their fears are real or not, you have an opportunity. You don't always have that opportunity. I think you're somewhat evading what one of the factual findings of the magistrate judge was. And I'm quoting from the magistrate judge's opinion in order. Believing an assault was taking place, the officers rushed to the front entrance, which had a glass screen door that was closed and a solid front door that was slightly ajar. And now you're just saying, oh, there's a glass door. But there's no statement in the findings of facts that the officers could see in fully and see what was happening. Well, it's our position, and just from reviewing the body cam, that if they had simply gone to the door and looked through that crack, they could have seen Mr. Hearn in plain view, on the phone, sitting on the couch. If we assume that it was within the exigent circumstances doctrine for the police to go in, then does the rest of your case fall apart? Well, if you're going to allow them actually to go into the home, then I think the second issue is once they actually cross that threshold, once they have Mr. Hearn in plain view, once they realize, oh, wait a minute, this slapping noise, this loud noise, apparently he's on the phone. At that point in time, rather than demanding Mr. Hearn to stand up, let me pat you down, let me put my hands on you, let me order you around. At that point in time, since these officers, at that point, with weapons drawn, once you cross that threshold, if you're going to allow them to cross the threshold, at that point, once they're in the home, shouldn't they then say, oh, wait a minute, we don't have an exigency. Wait a minute, let me extricate myself from this home, because I just entered this home. Wait, how do they know just by seeing him, how do they know there's not a victim in the bedroom? How can they be sure they got a call? They have an obligation as officers to dispel that, and for their own safety in a highly combustible situation, officers are permitted to pat people down. I mean, it's a very low threshold. We've held burglary is enough. The D.C. Circuit's held car theft is enough. The 8th Circuit's held bicycle theft is enough to pat people down, suspicion of all these things. Credit card fraud. And I understand that it is a fairly low threshold, but in this case, there was no information that he was armed and dangerous. There's no information that, at this point in time, that he was engaged in any kind of violence. I don't know, but if they're going to look through the house for a victim, they have a right to secure the occupants and make sure that both their safety. Look, in these days where officers are highly suspicious because they're getting shot, people are getting shot by officers, there's a lot going on. It's a combustible situation. The best course for everyone is for them to dispel their suspicion and secure the premises  I understand. Your red light is on, so if you want to respond. All right. What you're appealing is the denial of your motion to suppress the rifle that was found. I'm sorry. Your appeal is a denial of your motion to suppress the discovery of the rifle. It's really the big issue in the appeal is whether or not the weapon should be suppressed. Yeah, that's the order you're appealing. Right. Okay, so you have two issues. You argue that they entered the residence without a warrant. There was no exigent circumstances. The other issue you've raised, you allege that the frisk, the pat-down, was illegal. Right. Even if you were correct on that, how is there a causal connection between the pat-down and the discovery of the rifle? Well, it's our position that the pat-down sort of went beyond the scope of what they were initially. So what? How does that have anything to do with the discovery of the rifle? Well, it's our position that them actually crossing the threshold, if you're going to allow that, once they realized, and it's our position, that it was plain that he was just talking on the phone at that point. So therefore, they should have exited the premises at that point. Okay, what does the pat-down have anything to do with discovery for the third time? Does it have anything to do with discovering the weapon, the pat-down? Well, the weapon certainly wasn't on him. It was actually on the couch, and it was a spontaneous utterance. Okay, so isn't it just immaterial, the whole pat-down? Well, Why do we have to address that issue? Well, I think that you have to address the issue because our point is that it prolonged their, it prolonged The pat-down was very quick. I watched the video. It was very quick. It's not like it added another five minutes to the encounter or anything. Right, but our point is that that seizure was unlawful because at that point in time, when this seizure occurred, this pat-down occurred. Okay, a seizure is different than the pat-down. You're challenging the right to pat him down at that point. I don't think you're even, your brief doesn't challenge the seizure. You directly challenge whether there was cause for the pat-down. I think I just don't see how it's material. You would have to have a causal connection between an alleged constitutional right and the discovery of the weapon. I don't see any causal connection. It's our point, I mean, it's our position that the pat-down was an illegal, basically amounted to an illegal seizure. I know that. That's not my question. Okay. Can you answer it? How is there a causal connection between the pat-down and the discovery of the rifle? Well, without that seizure, there would not have been the statement that would have been made. Without a seizure, okay. You're getting back down to seizure as opposed to pat-down, okay. I guess you don't have an answer. If the pat-down were legal, if the pat-down were constitutional, does your claim fall apart? If the pat-down is legal, then we don't have an answer. That's the end of the case. Then it is. All right. Thank you. Thank you. Good morning. May it please the court. Regina Thompson on behalf of the United States. This court should affirm the district court's ruling denying the appellant's motion to suppress for three reasons. First reason is that the officers responding to the call made by Ms. Harden, that their entry into that home was justified by exigent circumstances based on what the officers knew before they made it to the home and what the officers heard immediately upon entry. The second reason is that the pat-down conducted seconds after the officers entered the home was a legal pat-down justified by reasonable suspicion that he was armed and dangerous based on the surrounding circumstances. Additionally, no evidence was recovered as a result of that pat-down. And lastly, none of Mr. Hearn's statements about the existence of the gun in the home were the subject of a custodial interrogation, and these were all voluntary statements. As to the first point about officers' entry into Mr. Hearn's home, this was justified by exigent circumstances. Officers testified at the suppression hearing that they believed that someone was inside the residence being assaulted. And this court has held that officers may enter a home when they believe that someone is being harmed inside. And given those circumstances, the fact that Officer Tracy had contact with the residents of that home on a prior occasion where he observed blood on the stairs leading into the house and blood inside the home and Ms. Harden, the complainant in this case, being in the hospital, that coupled with this 911 call that Mr. Hearn was at the residence. Can I go back to Judge Griffin's line of questioning, which it seems that he's come up with a winner for you all that I don't know, did you raise the question of whether independent of the pat-down, because as I understand your three arguments, the entry is permissible, pat-down is permissible, and statements are voluntary. Yes, Your Honor. His point's a good one, which is the pat-down, regardless of whether it was permissible, didn't derive any evidence. The evidence, as your friend on the other side said, was a spontaneous utterance that then showed them where the gun was. And you can see that on the audio and videotape. Did you argue that below or in your appeal here? Yes, Your Honor. It's actually in a footnote. In note three, is that enough? You're talking about footnote three in your brief? I believe, I'm not sure the exact number of the footnote. Okay, but just describe it. Just an aside that this pat-down did not lead to the discovery of any evidence in this case. Didn't include the firearm or any statements made by Mr. Hearn. So that was included in the brief, but it was just in a footnote, Your Honor. And that is something that we point out, but irrespective of that, the pat-down was justified by a reasonable belief that Mr. Hearn was armed and dangerous. The information that the officers knew at the time before they entered the home, coupled with once they are walking up at a steady pace to this residence and immediately hear screaming sounds and this loud, distinct noise before they open up the door, that justifies them entering to stop what could possibly be a domestic assault occurring on the inside. And even after they open up the door and see Mr. Hearn on a cell phone and see an individual coming from the back room, it's still not apparent to the officers where the complainant, Ms. Harden, is at this time. She's still not visible to officers and is still unknown. Let me ask you this, because your friend says, look, at that point they know an assault's not taking place. In other words, okay, let's assume the entry's permissible because they hear the slap. They know the assault's not taking place. What gives them the right at that point to pat him down? Well, Your Honor, my response would be that they don't know what's going on still at that point because they don't see the complainant anywhere in sight in the home. They do see a person fitting the description that Ms. Harden provided to dispatch. They see that person sitting on the couch. There's another individual walking from the back of the residence, but they don't see the entire residence. And even at that time when they enter the home, they still don't know for sure where those sounds came from because there are some loud sounds that occur just before they open up the door and make entry into the home in addition to this yelling noise. They patted Mr. Hearn down before they realized that the complainant was on the phone with Hearn. Is that right? That is correct, Your Honor. At that point, seconds into them entering the home, they pat Mr. Hearn down. They also pat down the other unnamed individual for officer safety because, as I mentioned before, they still don't know where these noises came from. And then at some point early on, they handcuff Mr. Hearn. Do they handcuff the other man in the room? They do not handcuff the other individual in the room. So what's the basis for handcuffing Hearn? Mr. Hearn does fit the physical description that was provided by Ms. Harden, the complainant, as the person that she doesn't want to be assaulted by or she doesn't want him hitting on her. So they did secure him. But before they secure him with the cuffs, he says to the officers, there's a gun in the house, can I show you where it's at? So he lets the officers know that there is a weapon present in the home. And officers at that time, they don't know where this weapon is, but they do know, based on the information that they had before they entered the home, that he has a history of violence. So they secure him, and the other individual is allowed to put his shoes down, and he sits on the couch. So there were two voluntary statements by Hearn before he was handcuffed?  That there was a weapon in the house? Yes, Your Honor. He made the first statement. It was after he was patted down, correct? Yes, first statement was after the pat down. The second statement was when the officer asked for his identification. He said, my name is DeCarlius Hearn, there is a weapon in the house. Am I right that the officers corroborated what you're saying, which is they were concerned about the victim because when didn't, I'm trying to remember this, but I thought when he said there's a weapon in the house, they said we don't care about that right now. That is correct. At that moment, they were concerned with securing Ms. Harden, the person who made the call to 911, and they had not yet conducted their protective sweep for any other individuals in the home. Then, of course, after they conduct the sweep, they learned that there is a minor child present in the home, in addition to the other unsecured individual in the living room of the residence, which would have justified them asking for safety reasons, okay, so there's a weapon in the house, where's the weapon? Then from there, Officer Tracy makes clear that he's trying to make the weapon safe at that point. Shouldn't they have given Miranda warnings if Hearn is handcuffed and he's not free to leave, and then the officer asks him where is the weapon? Your Honor, no. Under these circumstances, the government submits that this was not a custodial interrogation. He was briefly detained for the purposes of making sure that he was secure for officer safety reasons and while they conducted the protective sweep. And the interrogation part, this was not an interrogation because officers didn't ask that question for the purposes of eliciting an incriminating response. As evident in the body worn camera, Officer Tracy said, I'm just trying to secure the weapon or make the weapon safe. I don't really understand how the officers can say early, we don't care where the weapon is, when they don't know if there are other people in the house. And then all of a sudden, they can handcuff Hearn and then ask him directly, without giving Miranda warnings, where is the weapon. It doesn't seem logical. Their primary concern was securing the safety of Ms. Hearn upon entering the home because they didn't see her or know where she was. Once they realized she was not in the home and Mr. Hearn, who has this history of violence, once he was secured, officers felt comfortable enough to go ahead and ask him. Because under the public safety exception, even if the court were to find that this were a custodial interrogation, under the public safety exception, they were warranted in securing that weapon. As mentioned before, there was a minor child present in the home. Officers didn't know where this weapon was. There was also another unsecured individual sitting in the living room with the officers at the time. And officers did not know, so for the purpose of their safety and the safety of the other people in the home, they needed to know where that weapon was. It would not have been sufficient for them to just stop, leave, go out and get a warrant and come back and search for the firearm. They needed to know for safety reasons at that point. Ms. Thompson, in this appeal, has the defendant raised a Miranda issue? No, Your Honor. Do we need to address it then? No, Your Honor, we don't need to address that. Thank you. And if there are no further questions, that concludes the government's argument as it pertains to the suppression of the firearm recovered in this case. Thank you. Let me just conclude with this. They had a description of Mr. Hearn. They had been there a month before. They had a description. He's in a white shirt. He's in jeans. When they crossed that threshold, even if they weren't required to peek through the door because of this so-called exigency, once they crossed that threshold, once they saw this individual in jeans and a t-shirt, simply sitting there on a couch, at that point, they should have put their weapons up. They should have walked out the house. They should have asked Mr. Hearn to step outside with them. Instead, they proceeded further into the house. That sounds like a sharp problem. To judge Moore's questions, did you raise Miranda because I didn't see it? Miranda doesn't really get us anywhere in this case, I don't really believe, Your Honor. So you are not raising a Miranda question? No. It doesn't really get us anywhere. So that's why we can't suppress the fruit with Miranda. And so the statement itself, we're not really challenging. But anyway, Your Honor, it's a pleasure to be before the court. Certainly, it's a privilege to be here in person. We know that you don't do that in every case, especially with this pandemic. But we wanted to thank you on behalf of Mr. Hearn and on behalf of my office for allowing us to come in. Thank you all very much. Thank you. Thank you both for your argument, and the case will be submitted. And the clerk may call the next case.